## WIGGINS & JOHNSON, APPELLANTS, vs. ROBERT WILLIAMS, APPELLEE.

1. Where several interlocutory orders are made in a case, and only certain ones specified are appealed from, the appellate court will be confined to the orders mentioned in the appeal.

2. Constitutional provisions, similar to that contained in the third section of the Bill of Rights of our Constitution, were designed to preserve and guarantee the right of trial by jury in proceedings according to the course of the common law as known and practiced at the time of the adoption of the Constitution.

3. The guaranty of the right of trial by jury was intended to provide for the future as well as the past, and to secure the right of such trial in all cases whether then or thereafter arising which would properly fall within those classes of rights to which by the course of the common law the trial by jury was secured.

4. The Legislature may create new rights unknown to the common law procedure of trial by jury, and may organize new tribunals without common law powers to adjudicate such rights without a jury, but a mere change in the form of an action will not authorize the submission of common law rights, in the trial of which according to the course of the common law a jury was employed, to a court in which no provision is made to secure a jury trial.

5. Courts of chancery are not strictly courts according to the course of the common law, and the constitutional guaranty of trial by jury has no reference to such courts in their recognized sphere of equity jurisdiction, nor does such guaranty extend to all cases at law, as there are proceedings in many inferior courts,

and many summary proceedings in *nisi prius* court in which a jury was never employed.

6. Prior to the enactment of Chapter 3834, act of 1889, the court of chancery in this State had no jurisdiction to enjoin a mere trespass upon land and the boxing and scraping the trees thereon for the purpose of making turpentine, or the removal of turpentine therefrom, where no other element of irreparable injury or recognized ground of equity jurisdiction, was alleged.

7. Prior to the adoption of our first Constitution in 1839, securing and continuing the right of trial by jury, the court of chancery in this State did not exercise jurisdiction to enjoin the mere cutting and removal of the ordinary growth on timbered lands; but in order to give the court jurisdiction in such cases it had to be further shown that the injury was irreparable in the sense that full and adequate relief could not be obtained at law, or that the trespass went to the destruction of the property in the character in which it had been enjoyed, or that it was necessary to prevent a multiplicity of suits.

8. In a suit to enjoin a trespass upon land the complainant must have title, and, as a general rule, be in possession, in order to successfully invoke the aid of the court by injunction, and if his title is brought in question under facts showing a substantial dispute in reference thereto, the court ordinarily will not enjoin; or if an injunction has been already granted, will not make it perpetual until there is a settlement of the title at law, unless in cases of serious and irreparable injury the aid of the court is invoked to preserve the property pending a legal suit already instituted to test the legal right.

9. The second section of the act of 1889 (Chapter 3884) extends the powers of the court of chancery in the cases therein provided for, beyond the limits of its jurisdiction as exercised when the right of trial by jury was first secured in this State by constitutional provision, in this, that claimants of timbered lands are given the right to have an injunction against the trespasses mentioned without reference to the character of the injury as being irreparable or the adequacy of the legal remedy for the wrong, or actual possession of the claimant.

10. When a court of chancery in the exercise of its general or concurrent jurisdiction assumes the right to dispose of a case for one purpose, it will proceed to the settlement of the entire case, even to the adjustment of legal rights connected therewith, which otherwise would be beyond its powers.

11. While in all cases in which a court of equity, prior to the adoption of the Constitution, assumed jurisdiction for one purpose and proceeded to a complete adjustment of the entire case, even to the settlement of strictly legal rights, the right of trial by jury as to the legal question can not be invoked; still it is not in the power of the Legislature to confer upon the court of equity jurisdiction to grant injunctions in matters with respect to which its jurisdiction did not extend before the adoption of the Constitution, and draw to it a legal cause of action cognizable exclusively at law and trialable by jury, and have both disposed of by the court without a jury.

12. To the extent of conferring jurisdiction on the court of chancery to enjoin the tresspasses mentioned in the second section of the act of 1889, *supra*, by a mere trespasser without color of right or authority, the act can operate; but to the extent of awarding an account for damages for a mere trespass cognizable at law, and in respect to which the court of equity had no jurisdiction independent of the statute, it impairs the right of trial by jury according to the course of the common law and secured by the Constitution.

Appeal from the Circuit Court for Suwannee county.

### STATEMENT.

A bill in chancery filed in this case by appellee against appellant alleges, in substance, that the complainant and one Robert T. Hall, prior to the 20th day of September, 1890, were engaged in the business of producing and manufacturing naval stores, resin and spirits of turpentine in Suwannee county, and became indebted to their commission merchants, Ellis, Young & Co., in a sum of money which they could not at the time pay, and in order to pay and fully settle said indebtedness, conveyed to said Ellis, Young & Co. the interest of complainant and Hall in certain lands that were boxed for turpentine purposes. The interest conveyed, it is alleged, was the yield of turpentine from the boxed trees on the lands situated in said

county and described in the bill, and containing about one hundred thousand boxes. It is averred that Hall was settled with and. went out of the business, and that the settlement with Ellis, Young & Co. left the other turpentine lands and business of complainant unencumbered on account of any indebtedness to Ellis, Young & Co., or other parties in Savannah, with whom complainant and Hall had traded; that after the settlement with Ellis, Young & Co., which was on the 20th of September, 1890, complainant had, among lands boxed for turpentine, certain lands, the trees on which had lately been boxed—called virgin dips—containing about four and one-half crops, of ten thousand boxes to the crop; the lands containing the four and one-half crops being described in the bill. It is further alleged that complainant was the lessee of the turpentine timber and sole owner of the property described; that Ellis, Young & Co. sold and conveyed their said interest acquired from complainant and Hall to the defendants about the 20th of September, 1890, and a few days thereafter they entered upon, took possession of and worked the four and one-half crops belonging to complainant, and had gathered the turpentine from the boxed trees thereon, carried it off the land and appropriated it to their own use, and that they had continued to do so to the commencement of the suit; also that they had been distilling the turpentine into resin and spirits with other turpentine from their own trees, and claim the whole as their own, and that they did so after being forbidden by complainant, and after they knew that they were not the boxed trees purchased from Ellis, Young & Co.; that defendant may claim that their purchase from Ellis, Young & Co. contains the land in section 32, which is true, but the same is township 3, R. 11, S..

and E., and not in section 32, township 2, R. 11, S. and E., which contains the new boxes of complainant. The bill alleges the yield of the four and one-half crops and states the value of the spirits and resin at $900 each dipping, and that the dippings should have commenced on the 20th of September, 1890, the boxes being then full, and continued monthly thereafter. It is further claimed that defendants should account to complainant for the turpentine so wrongfully taken from his crops, and that they should be enjoined from interfering with his turpentine lands. It is also stated on the belief of complainant that defendants had no property in the county except what they procured from Ellis, Young & Co. and their stock, fixtures, and what spirits and resin they had on hand gathered from their own and complainant's said crops. The prayer of the bill is for an injunction, an account, and for process. A demurrer to the bill was overruled.

The answer filed by defendants admits that complainant and Hall were engaged in the business stated; that they became indebted to Ellis, Young & Co., and in order to settle with them, conveyed the property as alleged in the bill, upon which there were about one hundred thousand turpentine boxes. It is alleged that the property stated to have been conveyed to Ellis, Young & Co. was not the only property sold and conveyed to them, but complainant and Hall failed in business and conveyed their entire turpentine interest as copartners, consisting of turpentine still, wagons, mules and all utensils and equipments belonging to said turpentine business, to Ellis, Young & Co., the purpose and intent of complainant and Hall being to surrender, without reservation, their entire copartnership interest in said business to Ellis, Young & Co.;

that complainant and Hall, having become greatly indebted and insolvent, and being desirous of settling their indebtedness, transferred to Ellis, Young & Co. their entire turpentine interest, and by said transfer made a full settlement of their copartnership indebtedness to Ellis, Young & Co. Further, that it was not true that complainant was the owner of the property which he claims in his bill; that the land was held by lease by the firm composed of complainant and Hall, and the trees thereon had been boxed for turpentine purposes, and worked by them in their turpentine business, together with all the balance of their turpentine farm which they conveyed to Ellis, Young & Co. in settlement of said indebtedness to them, and that it was the purpose and intent of complainant and Hall to convey their entire interest in the land to which complainant lays claim, and that said land was left out of the deed to Ellis, Young & Co. through inadvertence on the part of complainant; that complainant furnished the description of the property contained in the deed to Ellis, Young & Co., and his purpose and intent was to give a full and complete description of all property owned by him and Hall as partners, whether held in fee, or by lease for years, and that when such description was given, complainant represented that it embraced the entire copartnership property of himself and Hall. It is then alleged that defendants purchased the same property from Ellis, Young & Co., believing at the time, from representations of complainant, that they were purchasing the entire turpentine farm which had been owned and worked by complainant and Hall; and defendants allege that complainant himself believed at the time that the land which he now claims was described in the deed to Ellis, Young & Co.; that discovering,

sometime afterwards, the omission of the land from the description in the said deed, he set up a pretense that he had not conveyed it, and still had title to the same; that said pretense and claim on the part of complainant were a fraud upon the rights of defendants, as they were led to believe by complainant and Hall that said land was conveyed to Ellis, Young & Co., and that they (defendants) had acquired by their said purchase the entire turpentine farm aforesaid. Also, that the pdrchase from Ellis, Young & Co. by defendants comprised the same property sold to the former by complainant and Hall, but the deed to defendants was not executed until a considerable length of time after they had taken possession of the land and worked the said turpentine farm. The allegations of the bill as to the yield of turpentine and the value of the same are denied. Replication was filed to the answer.

On application of complainant an injunction was granted, and defendants moved to dissolve it. On the hearing of this motion the court ordered that upon defendants filing a bond in the sum of $1,000 the injunction granted be so far modified as to allow defendants to dispose of the manufactured naval stores, spirits and resin distilled by them from crude turpentine taken from the boxes claimed by complainant.

Certain proceedings were had in reference to a violation of the injunction, but they claim no attention on the present appeal.

At the hearing on the contempt proceedings the court made a further order permitting the defendants to file a bond in the sum of $1,400, in lieu of the one already filed by them, and upon the filing of such bond, that the injunction be dissolved. The fourteen-hundred-dollar-bond was filed, and subsequently complainant filed a petition setting forth that said bond

was insufficient to indemnify him in the damages he had sustained up to that time, and that if the court was satisfied on the showing to be made that said bond was insufficient, that defendants be enjoined from shipping or disposing of any of the manufactured naval stores then in the county or State, and also that they be prohibited from shipping or removing said naval stores from the premises claimed by complainant, or in any way disposing of them until the final hearing of the case.

The cause was referred to an examiner named, to take the evidence in the cause and report it to the court. An order was also made that the question of the sufficiency of the bond as to the amount be referred to the master, who was directed to take proof and report whether or not the bond for $1,400 was sufficient to indemnify complainant against loss by reason of the alleged trespasses of defendants, should it finally appear that complainant was entitled to damages, and what amount of damages had accrued from the 20th of September, 1890, to the date of the order. Also whether or not said bond was sufficient, in the event complainant recovered at the final hearing, to indemnify him against loss to the date of the order, and such further damages as might result to him by reason of the continued hacking of the trees and removal of crude turpentine from the premises in question, from the date of the order to the first day of October, 1891.

The master reported his findings on the question of the sufficiency of the bond, and also the evidence upon which such findings were based. There was filed with this report of the master a written agreement of counsel for the respective parties to submit the evidence reported to the court on all the issues in the cause, re-

serving the right for either party to urge objections to testimony deemed to be improper. The cause was set down for final hearing, and at that time counsel for defendants made a motion to strike out and suppress certain portions of the evidence, and some of the evidence objected to was supressed.

On the 11th of June, 1891, the day fixed for the final hearing of the cause, the court made an order directing the examiner, appointed to take the evidence in the cause, to forthwith report the evidence of the witnesses, or show cause why he failed to do so. On the 13th of June, 1891, the court proceeded to hear the cause upon the pleadings and the evidence reported, with the agreement of counsel, and decreed that complainant was entitled to recover damages for the removal by defendants of turpentine from the four and one-half crops of turpentine boxes mentioned in the bill, both before and since the institution of the suit, and the master was ordered to take an account of the damages to complainant by reason of the removal of turpentine from said crops by defendant from the 20th of September, 1890, until the hearing, and that in taking said account he was to use the pleadings and proofs already taken, and such other evidence as he might deem advisable, or that the parties might offer.

In response to the order of June 11th, 1891, to report the evidence of witnesses, or show cause for failure to do so, the examiner reported, on the 15th day of that month, that he proceeded to take testimony in the cause, and counsel for complainant offered no evidence before him as examiner, but postponed the taking of evidence until the testimony in reference to the sufficiency of the bond was taken, and that after such testimony had been taken, counsel for both parties entered into the agreement which had been reported with

the testimony taken, and that after the receipt of the order of June 11th he notified counsel that he was ready to take the evidence as examiner, but none was offered. Under the reference in the decree of June 13th, 1891, the master examined witnesses on behalf of complainant, and reported that defendants had removed from the four and one-half crops of boxes claimed by complainant, crude turpentine which, when manufactured into spirits and resin, would amount to $5,235.16, on which the profit was $1,500. The account stated by the master in favor of complainant was $1,-500, and the account and testimony upon which it was based were reported to the court. Motion was made by complainant to confirm the report of the master, and for decree for the amount reported, and that defendants be enjoined from further trespassing upon the boxes in question. On the hearing of the motion to confirm the report and for decree, the court, on application of defendants, granted ten days' time in which to file exceptions to the master's report, and also ordered that defendants be enjoined from further dipping crude turpentine from the four and one-half crops of turpentine boxes claimed by the complainant. This order was made on the first of July, 1891. Exceptions to the report were filed, and upon a hearing some were overruled and some sustained in part, and the cause was again referred to the master to take an account and report to the court. Such report was made and notice given to confirm it. Thereupon defendants entered an appeal from the decree rendered on the 13th of June, 1891, directing the master to take an account of the damage to complainant by reason of the removal of turpentine from the boxes claimed by him, and also from the decree rendered July 1st, 1891,

enjoining defendants from further dipping turpentine from said boxes.

Further facts bearing on the questions involved in the appeal taken are stated in the opinion.

*B. B. Blackwell*, for Appellants.

*J. L. Frazee* and *M. E. Broome*, for Appellee.

MABRY, C. J.:

The interlocutory orders appealed from in this case are those made on June 13th and July 1st, 1891, and we are confined to them at this time. Mann vs. Jennings, 25 Fla. 730, 6 South. Rep. 771; Lenfesty vs. Coe, 26 Fla. 49, 7 South. Rep. 2. The order of June 13th determined that appellee (complainant below) was entitled to recover damages by reason of the removal by appellants of turpentine from the four and one-half crops of boxes on the lands, described in the bill of complaint, both before and since the institution of the suit, and the master was ordered to take an account of said damages from the 20th of September, 1890, when, it is alleged, appellants took possession of said turpentine boxes, until the hearing, and in taking the account the master was directed to use the pleadings and proofs then in the cause, and such other evidence as he might deem advisable, or that the parties might offer. After the cause was at issue, an examiner named was appointed to take the testimony therein, and there was also an order directing the master, but not designating any one as such, to take testimony and report as to the sufficiency of a bond that had been executed in the case by appellants under the order of the court. The examiner named acted, without objection to the parties, as master in taking testimony as to the sufficiency of the bond, and such testimony ex-

tended to the entire merits of the case. By agreement of counsel, the testimony taken on the question of the sufficiency of the bond was reported to the court as the testimony on all the issues in the case, and it was upon such testimony that the decree of June 13th was made.

It is insisted for appellants that the testimony did not authorize this decree, and further that the Legislature could not confer upon the Circuit Court, exercising chancery jurisdiction, power to award damages for a mere trespass. The inhibition of such legislation, it is claimed, is found in the third section of the Bill of Rights, that "the right of trial by jury shall be secured to all, and remain inviolate forever." Counsel also claims that the court erred in that portion of the order directing the master to take further evidence in stating the account, in view of the agreement of counsel reported by the master.

The case arose since the adoption of the act of 1889 (Chapter 3884), the second section of which provides "that courts of chancery shall entertain suits by any person or persons claiming any timbered lands in this State to enjoin trespasses on said lands by the cutting of trees thereon or removal of logs therefrom, or by boxing or scraping the said trees for the purpose of making turpentine or by removal of turpentine therefrom; and in such suits the said courts shall cause an account to be taken of the damage to the complainant from any of said trespassing before or after the institution of the suit, and decree payment of the amounts shown due upon such accounting by the defendant or defendants." The title of this act is "An act to extend the powers of the courts of chancery in this State." The testimony, conceded to be proper for the consideration of the court, sustains, in our opinion, the claim of appel-

lee to the four and one-half crops of turpentine boxes described in the bill. The deed from appellee and R. T. Hall to Ellis, Young & Co. does not embrace the four and one-half crops, and the written leases with the endorsements thereon, admitted to be proven, and in evidence, show title in appellee.

The answer sets up a defense that appellee and Hall sold all the property employed by them in their turpentine business to Ellis, Young & Co., who sold the same property to appellants, and that through inadvertence the four and one-half crops in question here were left out of the deed to Ellis, Young & Co. Appellants' deed from Ellis, Young & Co. does not embrace the said four and one-half crops, and while there is some testimony, brought out on cross-examination of a witness for appellee, tending to show that appellee intended to convey all of his property employed in the turpentine business, including the crops in question, to Ellis, Young & Co., still the record evidence supports appellee's title, and there is no sufficient parol testimony to overcome it. Appellants did not testify in the case, and, in fact, offered no evidence to sustain their allegation that they purchased from Ellis, Young & Co. the crops claimed by appellee. The testimony places appellants in the attitude of trespassers without claim or color of right upon the lands on which the boxed trees claimed by appellee are situated. The second contention for appellants under the decree of June 12th is, that the statute directing an account of damages for a mere trespass upon land in a court of chancery is unconstitutional, as such causes of action were triable by jury according to the course of the common law, and secured to the parties by the third section of the Bill of Rights in our Constitution. By the second section of the statute

referred to it will be seen that claimants of timbered lands are given the right to invoke the injunctional power of the court to prevent the cutting of trees thereon, the removal of logs therefrom, the boxing or scraping the trees for the purpose of making turpentine, or the removal of turpentine from the land, and in such suits the court is directed to cause an account to be taken of the damage to the complainant resulting from the trespasses before or after the institution of the suit, and to decree payment of the amounts shown to be due upon such accounting. In the case of Reddick vs. Meffert, 32 Fla. 409, 13 South. Rep. 894, the second section of the act in question, as applied to the facts of that case, was recognized as being valid, though its validity to any extent was not there questioned and no claim for damages was involved. The question presented in the present case demands a consideration of the constitutional guaranty of a jury trial for the assessment of damages under the conditions disclosed by this record. The third section of the Bill of Rights does not grant the right of trial by jury, but secures or guarantees such right existing at the time of the adoption of the Constitution. We said in Buckman vs. State ex rel., 34 Fla. 48, 15 South. Rep. 697, that "when the right of trial by jury is secured by constitutional provision in general terms like ours, and without any qualification or restriction, it must be understood as retained in all those cases that were triable by jury according to the course of the common law. The provision in the first Constitution, framed in 1838, that the right of trial by jury shall forever remain inviolate, contemplated, without doubt, a continuation of jury trials in all cases where such was the practice at the common law, and there is nothing in the subsequent Constitutions to indicate a change of

meaning in this respect.'' We have also held that the tenth section of the Bill of Rights was designed as a guaranty and protection of the citizen against a trial, except in certain enumerated cases, unless upon presentment or indictment by such grand jury as was shown at the common law. English vs. State, 31 Fla. 340, 12 South. Rep. 691; Donald vs. State, 31 Fla. 255, 12 South. Rep. 695. The authorities, with great uniformity, hold that constitutional provisions like ours were designed to preserve and guarantee the right of trial by jury in proceedings according to the course of the common law as known and practiced at the time of the adoption of the Constitution. Flint River Steamboat Co. vs. Roberts, 2 Fla. 102, S. C. 48 Am. Dec. 178 and notes; Blanchard vs. Raines, 20 Fla. 467; Tabor vs. Cook, 15 Mich. 322; Plimpton vs. Town of Somerset, 33 Vt. 283; North Pennsylvania Coal Co. vs. Snowden, 42 Penn. St. 488, S. C. 82 Am. Dec. 530 and note; Norris' Appeal, 64 Penn. St. 275; Watts vs. Griffin, 6 Littell (Ky.) 244.

Courts of chancery were not, strictly speaking, courts of common law, their jurisdiction and practice being derived principally from the civil law where no jury was employed, hence the guaranty of a trial by jury has no reference to such courts in their sphere of equity jurisdiction, nor does it extend to all cases at law, as it is perfectly clear that there were many proceedings in common law courts in which juries were not used. Proceedings in laying out highways and in assessing damages for the taking of private property for public use (Beekman vs. Saratoga & Schenectady R. R. Co., 3 Paige, 45, S. C. 22 Am. Dec. 679; Koppikus vs. State Capitol Commissioners, 16 Cal. 248; Ross vs. Irving, 14 Ill. 171), the proceedings in many inferior courts and many summary proceedings in *nisi prius* courts,

were without jury, and the guaranty of jury trial has no application to them. It is not necessary to go into an enumeration of such cases. A principle has been established in the jurisprudence of this country, that new rights unknown to the common law procedure of trial by jury may be created, and provision made for their determination in the absence of a jury, without violating the constitutional provision we are considering. But while it may be competent for the Legislature to create new tribunals without common law powers to adjudicate new rights without a jury, the mere change in form of an action will not authorize the submission of common law rights to a court in which no provision is made to secure a trial by jury. A statute in Michigan provided that any person claiming title to lands through the Auditor-General's deed, executed upon a sale thereof for non-payment of taxes, may file a bill in chancery to quiet his title without taking possession thereof. It was claimed that the statute gave the right to file the bill against one in possession of the land, although at the time of the adoption of the Constitution under which the act was passed, trials of titles to lands were at law. It was held that the statute did not have such meaning, but if it did, the Legislature was powerless to enact it. Judge Cooley, speaking for the court in Tabor vs. Cook, *supra*, said: "The present is one of those cases where a right to a trial by jury existed when the Constitution was framed, and that right must therefore 'remain.' Whatever proceeding the Legislature authorizes for the determination of adverse claims, the right of the party in possession to a jury trial must be kept in view, and some mode pointed out by which he can demand it. In civil cases at law, including ejectment suits, provision is made by statute and rule whereby either party may

obtain a jury; but there is no such provision for cases in chancery, and it is only in special cases, where the court desires the verdict of a jury for its own guid-ance, that issues in chancery can go before a jury at all. A defendant in chancery, therefore, can not waive a jury by failing to demand it, because no mode is provided by which any such demand can be made; and a statute which should authorize a bill in the nature of an ejectment bill, without at the same time provid-ing some means by which a jury could be had at the option of the defendant, would be in palpable disre-gard of the provisions of the Constitution which we have quoted." This court said in Flint River Steam-boat Co. vs. Roberts, 2 Fla. 102, S. C. 48 Am. Dec. 178, that this guaranty of trial by jury "has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy." The language of the court in Plimp-ton vs. Town of Somerset, *supra*, is that "the Consti-tution was intended to provide for the future as well as the past, to protect the rights of the people by every safeguard which their wisdom and experience then ap-proved, whether those rights then existed by rules of the common law, or might from time to time arise out of subsequent legislation. All the rights, whether then or thereafter arising, which would properly fall into those classes of rights to which by the course of the common law the trial by jury was secured, were intended to be embraced within this article. Hence it is not the time when the violated right first had its ex-istence, nor whether the statute which gives rise to it was adopted before or after the Constitution that we are to regard as the criterion of the extent of this pro-vision of the Constitution, but it is the nature of the controversy between the parties, and its fitness to be

tried by a jury according to the rules of the common law, that must decide the question." This opinion also very properly states that the "Constitution should be construed in the spirit with which it was enacted, and that any restriction of its present application should come, not through legislation and judicial construction, but from the direct, constitutional and considerate action of the people."

By looking into the jurisdiction of the court of chancery we find that originally it did not entertain jurisdiction to enjoin a mere trespass upon land, but in analogy to the remedy of injunction to prevent waste dependent upon privity of title between the parties, courts of equity extended the remedy to cases of trespass without privity of title under certain conditions. This extension of the remedy of injunction took place prior to the formation of our first Constitution in 1839. The basis of the jurisdiction in such cases was the probability of irreparable injury, the inadequacy of a pecuniary compensation, the destruction of the estate in the character in which it had been enjoyed, or the prevention of a multiplicity of suits where the right to the property was controverted by numerous persons, each insisting on his individual right. The courts are practically unanimous in announcing the rule that something more than a mere trespass, susceptible of adequate remuneration, must be shown before a court of equity will exercise jurisdiction. Carney vs. Hadley, 32 Fla. 344, 14 South. Rep. 4; Indian River Steamboat Co. vs. East Coast Transportation Company, 28 Fla. 387, 10 South. Rep. 480; Burns vs. Sanderson, 13 Fla. 381; Jerome vs. Ross, 7 Johnson's Ch. 315, S. C. 11 Am. Dec. 484; McMillan vs. Ferrell, 7 W. Va. 223; Gause vs. Perkins, 3 Jones Eq. 177, S. C. 69 Am. Dec. 728; Powell vs. Cheshire, 70 Ga. 357, S. C. 48 Am.

Rep. 572; 2 Beach on Injunctions, sec. 1125 *et seq.;*
Kerr on Injunctions, p. 112 *et seq.* What will consti-
tute irreparable injury, when a pecuniary recovery at
law will be inadequate, or what will amount to a de-
struction of the estate in the character in which it has
been held, has given rise to diversity of opinion. In
England, after the court of chancery commenced to
grant injunctions in cases of trespass, the remedy was
eventually pressed to the extent of restraining the cut-
ting of timber trees, on the ground that it was destruc-
tion and took away the substance of the land, but
without some element of irreparable injury in addi-
tion to the mere destruction of the timber the court
did not exercise such jurisdiction up to the time of the
foundation of our first Constitution in 1838, and in the
early settlement of this country when forest timber
was abundant, the court of chancery would not enjoin
and dispose of the entire case unless irreparable in-
jury, such as a verdict at law could not adequately
atone for, was alleged and shown. It must be con-
ceded that lately the jurisdiction of the court has been
extended in some cases to the prevention of injury or
the destruction of the ordinary growth on timbered
lands upon the theory that it is destruction of the es-
tate, but an examination of the cases shows, in our
opinion, that up to the time when the right of trial by
jury in common law cases was secured here by consti-
tutional provision, an injunction would not be granted
in chancery to restrain the cutting of ordinary growth
on timbered lands unless the injury was irreparable,
so that full and adequate relief could not be granted
at law, or where the trespass went to the destruction
of the property as it had been enjoyed or where it was
necessary to prevent a multiplicity of suits. In addi-
tion to the cases already cited, the following bear upon

the jurisdiction of the court of chancery to enjoin the cutting of timber: Green vs. Keen, 4 Md. 98; Shipley vs. Ritter, 7 Md. 408, S. C. 61 Am. Dec. 371; Powell vs. Rawlings, 38 Md. 239; Thompson vs. Williams, 1 Jones Eq. 176; Cowles vs. Shaw, 2 Iowa, 496; Stevens vs. Beekman, 1 Johnson's Ch. 318; Thatcher vs. Humble, 67 Ind. 444; Hillman vs. Hurley, 82 Ky. 626.

It was a fundamental doctrine of a court of equity, as stated by Pomeroy (vol. 1, sec. 181, Equity Jurisprudence) that when the court "has jurisdiction over a cause for any purpose, it may retain the cause for all purposes, and proceed to a final determination of all the matters at issue. For this reason, if the controversy contains any equitable feature, or requires any purely equitable relief which would belong to the exclusive jurisdiction, or involve any matter pertaining to the concurrent jurisdiction by means of which a court of equity would acquire, as it were, a partial cognizance of it, the court may go on to a complete adjudication, and may thus establish purely legal rights and grant legal remedies which would otherwise be beyond the scope of its authority." The decision of this court in the case of Griffin vs. Fries, 23 Fla. 173, 2 South. Rep. 266, was based upon this principle. The same principle is announced in Montgomery & F. Ry. Co. vs. McKinzie, 85 Ala. 546, 5 South. Rep. 322. It may be safely stated that in all those cases in which a court of equity, prior to the adoption of the Constitution guaranteeing a trial by jury, and by virtue of its general or concurrent jurisdiction for one purpose, had proceeded to a complete adjudication of the entire case, even to the settlement of legal rights which otherwise would be beyond its powers, it can not be successfully claimed that the guaranty of trial by jury exists as to the legal right. But while this is true, we are not

prepared to recognize the power in the Legislature to
confer equity jurisdiction to grant injunction in mat-
ters in respect to which such jurisdiction did not exist
before the adoption of the Constitution, and draw to
it a legal cause of action cognizable exclusively in a
law court and triable by jury, and have both tried by
a court without a jury.   Should such a power be con-
ceded in the Legislature, it is not perceived where the
limit of the power to abolish jury trials in cases exist-
ing according to the course of the common law would
be placed.   Scott vs. Neely, 140 U. S. 106, 11 Sup. Ct.
Rep. 712.   Before reverting to the statute under which
the bill was filed in the present case, further reference
to the practice of chancery in granting injunctions to
restrain trespasses is necessary.   The complainant was
required to have title and, as a general rule, be in pos-
session before he could ask the aid of the court, and if
his title was brought in question by the defendant, the
court ordinarily would not enjoin, or if an injunction
had been granted, would not make it perpetual until
the title had been established at law.   A mere denial
of complainant's title was not sufficient, and to entitle
the defendant to a trial at law his title must be based
upon facts showing a substantial dispute of complain-
ant's title.   2 Beach on Injunctions, secs. 1139, 1140.
It was also early established that the court would in-
terfere by injunction to prevent a trespass in some
cases where the title was in dispute, but this was in
aid of a suit at law, and the court interfered not for
the purpose of trying the legal title, but to preserve
the property pending the suit over the title at law.
West vs. Walker, 3 N. J. Eq. 279, note A; Shubrick
vs. Guerard, 2 Desaus. Eq. 616; Wadsworth vs. Goree,

42

96 Ala. 227, 10 South. Rep. 848; Bacon vs. Jones, 4 Mylne & Craig, 433.

It is evident, we think, that the statute has extended the powers of the court of chancery, in the cases provided for, beyond the limit of its jurisdiction as exercised when the right of trial by jury was secured in this State by constitutional provision. Claimants of timbered lands are given by the statute not only the right of an injunction for the trespasses mentioned, but also to have an account taken of the damages resulting therefrom, and this without reference to the character of the injury as being irreparable, the solvency of the trespasser, or the adequacy of the legal remedy for the wrong. The bill, it is apparent, does not allege a case sufficient for the interposition of a court of chancery to enjoin and assess damages independent of the statute, and while it may be conceded that in reference to the entire subject-matter of recognized equitable jurisdiction the Legislature may modify or expand the powers of the court as to such matters, this can not be done to the extent of depriving a party of a right guaranteed to him by the Constitution. No doubt can exist that the recovery of damages for a mere trespass was by legal remedy according to the course of the common law in which a jury was employed. The action of trespass was a well recognized legal remedy, and at the time of the adoption of our first Constitution the court of chancery did not enjoin a mere trespass and assess the damages incident thereto, unless some recognized equitable ground for the court's interference was alleged and shown. The statute authorizes an injunction against certain specified trespasses on timbered lands, and to the extent of conferring the power to prevent, under the conditions prescribed, the unauthorized entry upon such lands and

committing the acts mentioned, we see no good reason why it may not be done; but to the extent of authorizing a court of equity to assess damages for a trespass under the conditions prescribed by the statute, is unauthorized. It deprives a party of the right of trial by jury in a case according to the course of the common law when the Constitution was adopted. Of course where the court of chancery, in the exercise of either its general or concurrent jurisdiction, assumes the right to enjoin a trespass, it may, in order to do complete justice in the case, assess the damages resulting therefrom. But it is not competent, in our judgment, for the Legislature to confer the power to enjoin in cases where it did not exist before, and at the same time draw to it the incidental power to assess damages in a case clearly triable at law by a jury.

Our conclusion is, that the order of June 13th, directing the master to assess, was erroneous. We do not discover any error in the order of July 1st, 1891, the only other order from which an appeal was taken. In the order of June 13th the court, in directing an account of the damages to be taken, restrained appellants from further trespassing upon the premises of appellee, and the order of July 1st was made on motion to confirm the master's report of the damages. As has been stated, the testimony placed appellants in the attitude of trespassers without color of title, and on such showing the court was authorized to arrest any further trespassing upon the premises in question. This order will be affirmed. The order of June 13th, 1891, directing an account of the damages to be taken, will be reversed, and it is so ordered.