647 So.2d 877 (1994)
ST. PAUL FIRE AND MARINE INSURANCE COMPANY, as subrogee of Michael B. Schoenwald, M.D.; Urology Associates; Drs. Meyers, Strauch & Schoenwald, P.A.,; Michael B. Schoenwald, M.D.; Urology Associates and Drs. Meyers, Strauch & Schoenwald, P.A., Individually, Appellants,
v.
William J. SHURE, M.D. and South Broward Hospital District Physicians Professional Liability Insurance Trust, Appellees.
No. 92-2446.
District Court of Appeal of Florida, Fourth District.
November 2, 1994.
Rehearing Denied January 24, 1995.
Scott H. Michaud and Paul Buschmann of Michaud, Buschmann, Fox, Ferra & Mittelmark, P.A., Boca Raton, for appellants.
Ricki Lewis Tannen of Klein & Tannen, P.A., Hollywood, for appellees.
KLEIN, Judge.
Appellant St. Paul Fire and Marine Insurance Company, as subrogee of Dr. Schoenwald, appeals a directed verdict entered against it after a jury found it was entitled to contribution against a physician who settled with the plaintiff in a medical malpractice action. We affirm because we conclude that St. Paul did not establish that the settlement was not in good faith. We also hold that the issue of good faith here was for the court to decide, not a jury.
*878 Plaintiffs sued a urologist and an obstetrician for medical malpractice, alleging that their daughter contracted herpes at birth and suffered permanent brain damage as a result of the defendant's negligence. Plaintiff's theory of recovery against Dr. Schoenwald, a urologist, was that he had failed to diagnose herpes in the father after being told that the father was suffering from painful urination and had sores on his penis. The theory against the obstetrician was that the mother had told him that her husband had a pimple or blister on his penis, and that he had failed to properly advise her.
On the first day of trial the obstetrician, Dr. Shure, settled with plaintiffs for $250,000. The jury subsequently returned a verdict against the urologist, Dr. Schoenwald, for $2,900,000, which was settled on appeal for $3,000,000.
St. Paul, the insurer of the urologist, subsequently filed this contribution action against the obstetrician, arguing that his settlement with plaintiffs was not in good faith as required by section 768.31, Florida Statutes (1987), the Uniform Contribution Among Tortfeasors Act, and thus not a bar to contribution.
At the trial of the contribution claim, St. Paul called a medical malpractice lawyer, Howard Barwick, as its expert witness. He testified that the settlement between the plaintiffs and the obstetrician was not in good faith because it was made for tactical reasons and did not fairly represent the percentage of the fault of the obstetrician. In its 30 page brief, St. Paul devotes only 2 paragraphs to the testimony of Barwick, its only expert, and characterizes it as follows:
Mr. Barwick testified that the settlement between the BINGERS and DR. SHURE was not made in good faith, was made for tactical reasons, and testified that the settlement did not fairly represent the percentage of fault of DR. SHURE as it relates to the facts of the underlying case. Mr. Barwick also testified that the BINGERS settled for a smaller amount of money with DR. SHURE in order to get certain testimony from DR. SHURE that would otherwise not be available to them, in an attempt to increase their chances of getting a jury verdict against DR. SCHOENWALD.
Mr. Barwick further testified without objection that the $250,000.00 settlement amount offered by DR. SHURE and accepted by the BINGERS was not reasonably related in any manner to a fair and reasonable apportionment of fault between DR. SHURE and DR. SCHOENWALD based on the facts of the case as they existed prior to the underlying medical malpractice trial.
At the post-trial hearing on renewed motion for directed verdict, counsel for St. Paul acknowledged that there was no evidence of collusion or that Dr. Shure had testified improperly.
Testifying for the obstetrician in the contribution action were his defense counsel in the original action, Norman Klein, and plaintiff's counsel, Robert Spector. Also testifying were two experts, Ray Ferrero, Jr., and George Bunnell. Their testimony was essentially that the case against the urologist, who had examined the father and whose notes reflected symptoms of herpes, was far stronger than the case against the mother's obstetrician, who had never seen the father. The obstetrician acknowledged that the mother had told him that the father had burning on urination and he advised her to have him seen by a urologist immediately. Although the mother claimed she told the obstetrician that the father had lesions, the obstetrician was adamant that she had not. His notes reflected only that he had been told of the pain on urination.
Plaintiff's counsel testified that as discovery continued in the original case, the case against the obstetrician deteriorated. He was not able to obtain what he considered to be a qualified expert to testify against the obstetrician. He assessed the liability against the urologist as far better because his own records "hung him," and the urologist was unable to find a well qualified expert. In addition, plaintiffs experts against the urologist were the heads of urology at major universities and one of them had "written the book."
*879 The obstetrician moved for a directed verdict after St. Paul rested on its contribution claim, and the court seriously considered granting it, but decided to reserve ruling. The court again reserved ruling at the close of all the evidence, and submitted the case to the jury, which returned a verdict finding that the settlement was not in good faith. The obstetrician then filed a motion for renewed directed verdict, which the court granted, and St. Paul appeals.
The essence of St. Paul's argument is that since it presented an expert who testified that the settlement was not in good faith, a jury issue was presented. Significantly, St. Paul does not cite one contribution case to support its argument.
The obstetrician argues that the contribution cases involving the precise issue litigated here, good faith, support the court's conclusion that there was no issue of fact. He also argues that the determination of good faith in a contribution action should be decided by the court, not a jury. After reviewing the law in Florida, as well as in other jurisdictions, we have concluded that he is correct.
Section 768.31, Florida Statutes (1987), the Uniform Contribution Among Tortfeasors Act, provides in subsection (5):
RELEASE OR COVENANT NOT TO SUE.  When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
* * * * * *
(b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.
We first address the question of whether the issue of good faith in this contribution action should have been decided by a jury. Our supreme court defined contribution in Lopez v. Lopez, 90 So.2d 456, 458 (Fla. 1956), as follows:
The doctrine of equitable contribution is applied to prevent one of two, or more, joint obligors being required to pay more than his share of a common burden, or to prevent one obligor from being unjustly benefited or enriched at the expense of another.
As is apparent from the court's reference to the doctrine in Lopez as "equitable contribution," contribution is an equitable remedy. See Stuart v. Hertz, 351 So.2d 703, 706 (Fla. 1977) ("[T]he doctrine of contribution has been based upon equitable rights."); Love v. Gibson, 2 Fla. 598 (1849) (contribution is based on principles of equity).
Prior to the adoption of the Uniform Contribution Among Tortfeasors Act, Florida did not allow contribution between joint tortfeasors. See Seaboard Air Line Ry. v. American Dist. Elec. Protective Co., 106 Fla. 330, 143 So. 316 (1932). The Uniform Act modified the rule against contribution between joint tortfeasors, by providing that there is contribution, with some exceptions, one being that a tortfeasor who settles "in good faith" is not liable for contribution. The Uniform Act is thus a modification of the common law equitable doctrine of contribution. In fact, section 768.31(3) provides:
PRO RATA SHARES.  In determining the pro rata shares of tortfeasors in the entire liability:
(a) Their relative degrees of fault shall be the basis for allocation of liability.
(b) If equity requires, the collective liability of some as a group shall constitute a single share.
(c) Principles of equity applicable to contribution generally shall apply.
In Lincenberg v. Issen, 318 So.2d 386, 393 (Fla. 1975), our supreme court referred to the trial court's function under the Uniform Act in determining the pro rata shares of tortfeasors as the court's "equity responsibility." In Lincenberg, although the court discussed the Uniform Act, the Act actually was adopted after the accident in Lincenberg occurred. The court concluded that the common law rule of no contribution among tortfeasors was no longer justified with the advent of comparative negligence in Florida. The court's discussion of the history and merits of the principle of no contribution among tortfeasors uses the words "equitable" and "equity" throughout the opinion.
*880 Because contribution is an equitable remedy, and because the right to a jury trial only extends to actions at law, and not to suits in equity,[1] we conclude that a claim for contribution brought subsequent to the original suit by the plaintiff should be decided by the court, not a jury.[2]
We next address whether the evidence presented by St. Paul was sufficient to create an issue of fact as to lack of good faith.
In Frier's, Inc. v. Seaboard Coastline R.R. Co., 355 So.2d 208 (Fla. 1st DCA 1978), the first district traced the history and purpose of the Uniform Contribution Among Tortfeasors Act. When it was first written in 1939 (although not yet adopted in Florida), its main purpose was to promote the equitable sharing of responsibility among those jointly liable to an injured person. It did not, however, discharge the settling tortfeasor from contribution, unless the plaintiff agreed to limit what plaintiff could recover from other tortfeasors. The Act was revised in 1955, with the addition of the provision discharging from contribution the tortfeasor who makes a good faith settlement, in order to encourage settlements. Id. at 211. The court also noted that the Commissioner's Comment to the 1955 revision provides that the good faith requirement allows the court "to determine whether the transaction was collusive, and if so there is no discharge." Id.
The Frier's court quoted with approval the following language from a California case:
The notion of collusion advanced by the Uniform Law Commissioners implies something more than confederacy. Any negotiated settlement involves cooperation, but not necessarily collusion. It becomes collusive when it is aimed to injure the interest of an absent tortfeasor." River Garden Farms, Inc. v. Superior Court for County of Yolo, 26 Cal. App.3d 986, 103 Cal. Rptr. 498 (Cal.3d DCA 1972).
355 So.2d at 211.
In Seaboard System R.R. v. Goforth, 545 So.2d 482 (Fla. 5th DCA 1989), the settling tortfeasor rear-ended a vehicle, killing one person and injuring two others. After he settled for approximately $500,000 the non-settling tortfeasor sought contribution from him. The fifth district affirmed a summary judgment for the settling tortfeasor, observing that there was "no evidence of collusion or any other evidence of bad faith." See also Gold, Vann & White, P.A. v. DeBerry, 639 So.2d 47 (Fla. 4th DCA 1994).
An example of a collusive settlement which will not protect the settling tortfeasor from contribution occurred in International Action Sports, Inc. v. Sabellico, 573 So.2d 928 (Fla. 3d DCA 1991). In that case the jury verdict was $1,500,000 and the settling defendant, a relative of the plaintiff, settled with the plaintiff for $5,000 in the hopes that the tortfeasor who had to pay the remainder of the judgment would be barred from obtaining contribution against the settling defendant. The third district held that the collusiveness of the settlement was inconsistent with the good faith requirement of the Uniform Act.
In Sobik's Sandwich Shops, Inc. v. Davis, 371 So.2d 709 (Fla. 4th DCA 1979), the accident and trial had occurred prior to the adoption of the Uniform Act, and plaintiff's counsel advised the three defendants who were appealing that, if the appeal were affirmed, he would collect $1,000 from one of the tortfeasors, and the remainder of the $83,000 judgment from the other two defendants. After the appeal was affirmed the judgment was paid accordingly, and the tortfeasor who paid $50,000 sought contribution against the tortfeasor who paid $1,000. This court held that the $1,000 settlement was not in good faith because the amount was arbitrarily decided by the plaintiff based on cooperation by that tortfeasor with the claimant.
One of the primary goals of the Uniform Contribution Among Tortfeasors Act, *881 as we noted earlier, is to encourage settlement. Normally tortfeasors settle to limit their exposure for plaintiff's damages and to save the expense of litigation. If we were to allow settlements to be set aside for no reason other than that the settlement was not proportional to the exposure  the only basis in this case  much of the incentive for the tortfeasor to settle would be eliminated. In Noyes v. Raymond 28 Mass. App. Ct. 186, 548 N.E.2d 196, 199 (1990), the court said:
The goal of encouraging settlements may be achieved only to the extent that motions for discharge based upon settlements are routinely allowed, with extended hearings on the question of good faith the exception. If it were otherwise, a party seeking to avoid trial by settling a claim could rarely achieve that objective; either the issue of good faith would be the subject of a full trial or, as happened in this case, a defendant who settles with a plaintiff may, nevertheless, be forced to stand trial on the merits of the tort claim. Faced with such prospects, a defendant would have little incentive to enter into a settlement.
The Noyes court concluded that lack of good faith under the Uniform Act means "collusion, fraud, dishonesty, and other wrongful conduct." Id. 548 N.E.2d at 199.
Similarly, in Stubbs v. Copper Mountain, 862 P.2d 978, 984 (Colo.Ct.App. 1993), the court, in construing the Uniform Act, concluded:
We therefore hold that in Colorado the appropriate test to determine if a settlement is made in bad faith is whether the agreement was the product of collusive conduct intended to prejudice the interests of the non-settling defendants.
Since, in the present case, there was no evidence of collusion or other misconduct, the trial court correctly held as a matter of law that the settlement was in good faith.
Affirmed.
HERSEY and GUNTHER, JJ., concur.
NOTES
[1] Wiggins v. Williams, 36 Fla. 637, 18 So. 859 (1895).
[2] In a case where the finder of fact, judge or jury, has determined the liability of several defendants to the claimant, the Uniform Act provides that the "judgment of the court in determining the liability of the several defendants" is binding for purposes of contribution. Section 768.31(4)(f).