Gabina MALDONADO, as Personal
Representative of the Estate of
Alvin Maldonado, Plaintiff

v.

The FIRST LIBERTY INSURANCE
CORPORATION, Defendant.

Case No. 07–20710–CIV.

United States District Court,
S.D. Florida,
Miami Division.

April 22, 2008.

Ed Rubinoff and Andrew Moss, Kutner, Rubinoff & Moss, Miami, FL, for Plaintiff.

Gary J. Guzzi and Mark S. Shapiro, Akerman Senterfitt, Miami, FL, for Defendant.

### ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

ADALBERTO JORDAN, District Judge.

For the reasons which follow, First Liberty's motion [D.E. 36] for summary judgment is GRANTED, and Gabina Maldonado's motion [D.E. 33] for summary judgment is denied.

### I. FACTS

This bad faith case arises from an automobile accident on or about January 5, 2004,[1] between Alvin Maldonado and Julia Clinche, as a result of which Mr. Maldonado died. Compl. at ¶ 7. Ms. Clinche was driving an automobile owned by her husband, Carlos Clinche, and insured by First Liberty with liability limits of $25,000 per person. See id. at ¶ 8. Mr. Clinche reported the accident to First Liberty on January 6, 2004, the day after the accident occurred. See First Lib. Mot. for Summ. Jdgmt. at ¶ 4. That same day, First Liberty sent a letter to the Clinches stating that "the nature and extent of the damages and injuries being claimed suggests there is a potential exposure in excess of your policy limits...." See First Lib. Mot. for Summ. Jdgmt., Exhibit C. On January 8, 2004, First Liberty spoke with the Miami–Dade police department to obtain additional information about the accident, and also sent a letter to the Clinches asking for their cooperation. See id. at ¶ 5.

On January 23, 2004, First Liberty received a letter from Barry Snyder, Esq., indicating he had been retained by the estate of Mr. Maldonado and requesting photos of the accident scene and policy disclosures. See id. at ¶ 6 & Exhibit E. On January 28, 2004, Mr. Snyder demanded tender of the Clinches' policy limit of $25,000 along with an affidavit setting forth the Clinches' assets. See Maldonado Mot. for Summ. Jdgmt. at ¶ 4. Mr. Snyder, however, did not submit a proposed affidavit listing the specific information requested.

On January 29, 2004, First Liberty sent a letter to Mr. Snyder offering the full $25,000 policy limit, enclosing a release, and requesting that Mr. Snyder advise First Liberty as to when the estate had been set up and when he would like the settlement check to be forwarded. See First Lib. Mot. for Summ. Jdgmt., Exhibit G. That same day. First Liberty sent the Clinches a letter advising them that it had offered the full policy limit to settle the claim, with a proposed release in favor of the Clinches, but noting that the estate would not release the Clinches unless they completed an asset affidavit. See First Lib. Mot. for Summ. Jdgmt., Exhibit H.

First Liberty's letter further advised the Clinches that are lease would "terminate

---

1. The complaint and First Liberty's motion for summary judgment state that the accident occurred on or about January 5, 2004. See Compl. at ¶ 7; First Lib. Mot. for Summ. Jdgmt. at ¶ 2. The estate's motion for summary judgment states the date of the accident was January 4, 2004. See Maldonado Mot. for Summ. Jdgmt. at ¶ 4.

any personal exposure you may have to the plaintiff for damages arising from his or her claim against you. Therefore, it is to your advantage to obtain a release." *See id.* In addition, First Liberty advised the Clinches that the settlement condition requiring the affidavit was outside First Liberty's control, that First Liberty would not be able to comply with the settlement demand without obtaining the affidavit from the Clinches, and that the Clinches could retain an attorney at their own expense. *See id.* As noted earlier, Mr. Snyder had not sent First Liberty a sample affidavit of what he wanted. *See id.* at ¶ 9. With its letter to the Clinches, therefore, First Liberty forwarded a draft affidavit, which the Clinches subsequently completed. *See id.* at ¶ 5. That affidavit did not state what individual assets the Clinches possessed, but rather stated that the Clinches had "no assets that would be available to satisfy any claims." *See id.,* Exhibit I. First Liberty forwarded this affidavit, completed by Mr. and Mrs. Clinche, to Mr. Snyder on February 11, 2004. *See id.,* Exhibit K.

Mr. Snyder found this affidavit unacceptable because, in his view, it merely stated a legal conclusion and did not list any specific assets. *See* Maldonado Mot. for Summ. Jdgmt. at ¶ 4. On May 14, 2004, Mr. Snyder sent First Liberty a more detailed sample affidavit for the Clinches to complete. *See* First Lib. Mot. for Summ. Jdgmt. at ¶ 12 & Exhibit M. This sample affidavit requested, among other things, the Clinches' social security numbers and bank account numbers. *See id.* On May 17, 2004, First Liberty sent this more detailed affidavit to the Clinches with a letter which informed the Clinches that Mr. Snyder had found the previous affidavit "insufficient." *See id.,* Exhibit N. In this letter, First Liberty further advised the Clinches that "if you do not provide the requested information to us in sufficient time for us to forward it to plaintiff's counsel, plaintiff will, in all likelihood, not provide a release to you, even if we tender your policy limits." *See id.* The letter again advised the Clinches that they could retain an attorney at their own expense to assist them in these matters. *See id.*

The Clinches informed First Liberty that they would not complete the sample affidavit provided by Mr. Snyder because it requested personal information, such as social security and bank account numbers. *See id.* at ¶ 14; Maldonado Mot. for Summ. Jdgmt. at ¶ 6. On May 26, 2004, Brigitte Klein of First Liberty sent the Clinches a letter confirming a phone conversation during which Mr. Clinche refused to return the affidavit because it requested personal information and during which Ms. Klein "explained that this [refusal to complete the affidavit] may result in the estate not accepting the $25,000 which has been offered as your policy limits and you will advise us immediately of any suit papers if they are received." *See* First Lib. Mot. for Summ. Jdgmt., Exhibit O. Also on May 26, 2004, Ms. Klein sent Mr. Snyder a letter informing him that the Clinches "find these affidavits very invasive in their request of extremely personal information, which has nothing to do with any assets." *See id.,* Exhibit Q. She further stated: "**If you are willing to amend the affidavit in any way to address only the issues of personal assets, we will be happy to forward this on to our insured.** Our insured will not complete the affidavits with personal information requested at this time." *See id.* (emphasis added).

Mr. Snyder did not send a revised sample affidavit for the Clinches to complete, nor did he inquire as to what specifically

the Clinches objected. Rather, on June 16, 2004, Mr. Snyder sent First Liberty a letter in response, stating:

> You did not specify which part(s) of the affidavits you believe to be improper and your clients did not even answer the items they did not object to. Upon further review of the affidavits, we **find every request reasonable under the circumstances** .... Yes, the information requested in the affidavits is of a personal nature, but it is reasonable under the circumstances—your insureds left Mrs. Maldonado without a husband and three minor children without a father. You do not want to know how Mrs. Maldonado feels about your clients' objections to the inconvenience of providing personal information after what your clients have done.

*See id.*, Exhibit R (emphasis added).

On June 22, 2004, First Liberty forwarded this letter from Mr. Snyder to the Clinches along with a letter informing them that First Liberty had sent a check for $25,000 to the estate but would need the sample affidavit completed in order to secure a release of the Clinches. *See id.*, Exhibit T. This letter reminded the Clinches of its earlier warnings regarding the risks of not completing the affidavit. *See id.* That same day, First Liberty also sent a letter to Mr. Snyder, attaching a release to be completed and informing him that it had sent a check for the $25,000 policy limit to the personal representative of the estate. *See id.*, Exhibit S. First Liberty also informed Mr. Snyder that it had forwarded his June 16, 2004, letter to the Clinches, requested that they fill out the sample affidavit, and informed them of the risks of not doing so. *See id.*

On July 13, 2004, Mr. Snyder sent First Liberty a letter withdrawing the Estate's offer to settle the case for the policy limits because the Clinches refused to fill out the revised affidavit, returning First Liberty's check for the $25,000 policy limits voided, and changing the Estate's demand to $1 million to be paid within seven days or a lawsuit would be filed. *See id.*, Exhibit U. The letter further advised First Liberty that in order to avoid a bad faith claim against it, First Liberty should tender the $25,000 policy limit with no conditions other than a set off on behalf of First Liberty against a verdict. *See id.*

First Liberty sent this letter to the Clinches on July 16, 2004, along with a letter from Ms. Klein advising the Clinches that the estate had refused to settle for the policy limits because the Clinches refused to complete the sample affidavit and informing them of the new demand of $1 million. *See id.*, Exhibit V. Ms. Klein's letter on behalf of First Liberty also laid out the following explicit warning to the Clinches:

> We are sending you, for your review and reconsideration, the affidavit the claimant Estate has requested. We are not sure if the claimant Estate will even accept the affidavit along with the policy limit offer at this time, **but I request you again seriously consider completing and submitting the affidavit so we can try one more time to settle this potential lawsuit on your behalf.**

> I will continue to offer the Liberty Mutual limits of your insurance coverage in exchange for a full release, but I feel that, without the requested affidavit, the Estate of Mr. Maldonado will not possibly consider accepting our offer.....

> Due to the seriousness of this claim and the exposure in excess of your policy limits, we are again advising you that you may want to, at your own expense,

retain a personal attorney to help protect your interest with respect to such damages being claimed against you.

*See id.* (emphasis added).

On July 20, 2004, First Liberty sent another letter to Mr. Snyder along with another check for the $25,000 policy limit and a release to be completed. *See id.,* Exhibit W. On July 21, 2004, Ms. Klein of First Liberty sent another letter to the Clinches confirming a phone conversation she had with them on July 16, 2004. *See id.,* Exhibit X. In that letter, she confirmed that the Clinches still refused to complete any part of the sample affidavit Mr. Snyder requested and confirmed that the Clinches' sentiment was that the estate "cannot get blood from a stone" or cannot get funds the Clinches do not have. *See id.*[2] The letter further informed the Clinches that First Liberty was again sending the estate a check for $25,000 to settle the claims against the Clinches but that these funds would likely not be accepted and a lawsuit would likely be filed against them. *See id.* Ms. Klein told the Clinches that if they completed the sample affidavit now, the estate likely would not accept them with the policy limits but that she would continue to try to settle the claims against them on their behalf. *See id.*

On July 29, 2004, Mr. Snyder sent a letter to First Liberty, again returning the check First Liberty had sent for $25,000, and stating that the estate would not accept the payment of the policy limits because such payment was conditional upon

the execution of a release of the Clinches. *See id.,* Exhibit Y. The letter further warned First Liberty not to send the check again if it was conditioned upon a release of the Clinches and informed First Liberty that it was leaving the estate no choice but to file a lawsuit. *See id.*

When the case did not settle for the new demand of $1 million, the estate filed suit on December 23, 2004, against the Clinches in the Circuit Court of the Eleventh Judicial Circuit in and for Miami–Dade County, Florida. A consent judgment was subsequently entered against the Clinches in the amount of $3 million, of which First Liberty paid $25,000. The Clinches then filed for bankruptcy. *See* Clinche Depo. at 5–8. Ms. Maldonado subsequently filed this action alleging common-law bad faith against First Liberty in state court. First Liberty removed the case to federal court based on diversity jurisdiction, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446(b). Following discovery, both parties moved for summary judgment.

### II. APPLICABLE STANDARD

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party fails to prove an essential element of its case for which it

---

**2.** At his deposition, Mr. Clinche testified that his quote was actually about getting juice from a different kind of fruit. *See* First Lib. Mot. for Summ. Jdgmt., Exhibit P, 38–40. Ms. Klein's notes state that, in a phone conversation, Mr. Clinche corrected her quote of

him, stating that he said the estate could not "get orange juice from a grape." *See id.,* Exhibit B. Mr. Clinche testified that his sentiment was that the estate could not get money from someone who doesn't have any. *See id.,* Exhibit P, at 39:17–25.

has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. That is, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). In making this assessment, the court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir.1997), and "resolve all reasonable doubts about the facts in favor of the nonmovant." *United of Omaha Life Ins. v. Sun Life Ins. Co.*, 894 F.2d 1555, 1558 (11th Cir.1990).

## III. LEGAL ANALYSIS

Ms. Maldonado argues that judgment as a matter of law is proper against First Liberty because it acted in bad faith when it failed to take steps necessary to avoid an excess judgment against the Clinches. *See* Maldonado Mot. for Summ. Jdgmt. at ¶ 12–13. Specifically, she asserts that First Liberty did not take steps to address the Clinches' concerns about providing their social security and bank account numbers until the demand to settle within the policy limits had expired, did not offer to send someone to the Clinches' home to pick up the affidavit so they did not have to put their personal information in the mail until after the estate's demand was at $1 million, and did not suggest to the Clinches that they submit to a sworn statement in lieu of an affidavit until after the lawsuit was filed against them. *See id.*

She contends that "these alternatives—along with numerous others—could have been provided to Mr. Clinche and Mr. Snyder while the case could have settled for the policy limits." *See id.* She cites Mr. Clinche's testimony that, had First Liberty presented these alternatives to him, he "probably" would have agreed to them. *See id.* at ¶ 13.

Ms. Maldonado further argues that First Liberty "failed to adequately advise the Clinches of the probable outcome of litigation and to warn them of the possibility of an excess judgment." *See id.* at ¶ 14. Specifically, she maintains that First Liberty's warning—that if the Clinches did not sign the affidavit, the case would not settle and judgment could be entered against them in excess of the policy limits and "they would have to make good on the judgment"—was insufficient. *See id.* She argues that First Liberty should have informed the Clinches of particular consequences of an excess judgment, such as harm to their credit and having to reveal the judgment on a job application. *See id.* These alleged failures, Ms. Maldonado argues, constitute bad faith on the part of First Liberty.

First Liberty, on the other hand, responds that it is entitled to judgment as a matter of law because it acted in accordance with Florida law and did not engage in bad faith. *See* First Lib. Mot. for Summ. Jdgmt. at 2. First Liberty argues it cannot be held liable for bad faith where it fulfilled its good faith obligations, and tendered the policy limits, but the claim did not settle within the policy limits due to the Clinches' refusal to comply with additional terms of the settlement offer—the completion of the sample affidavit—outside First Liberty's control. *See id.* at 2–3.

 I agree with First Liberty. When an insurer undertakes the defense

of an insured, the insured becomes dependent upon the acts of the insurer. *See Macola v. Government Employees Ins. Co.*, 953 So.2d 451, 455 (Fla.2006). This places the insurer in a fiduciary relationship with the insured, and the insurer thus owes a duty to the insured to refrain from acting solely on the basis of the insurer's own best interest in considering a settlement. *See id. See also Allstate Indem. Co. v. Ruiz*, 899 So.2d 1121, 1125 (Fla. 2005); *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So.2d 55, 58 (Fla.1995). "The insurer cannot escape liability by acting upon what it considers to be for its own interest alone, but it must also appear that it acted in good faith and dealt fairly with the insured." *Auto Mut. Indent. Co. v. Shaw*, 134 Fla. 815, 184 So. 852, 859 (1938) (quoting *American Mut. Liability Ins. Co. of Boston, Mass. v. Cooper*, 61 F.2d 446, 448 (5th Cir.1932)). Thus, the essence of an insurance bad faith claim is that the insurer acted in its own best interests, failed to properly and promptly defend the claim, and thereby exposed the insured to an excess judgment. *See id. See also Macola*, 953 So.2d 451, 458; *Cunningham v. Standard Guar. Ins. Co.*, 630 So.2d 179, 181 (Fla.1994). I conclude that, based upon the undisputed evidence, no reasonable jury could find that First Liberty acted in its own best interest and in disregard for the Clinches in this case.

In Florida, the standard of care for insurers when undertaking the defense of their insureds is as follows:

> An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business..... The good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

*Boston Old Colony Insurance Company v. Gutierrez*, 386 So.2d 783, 785 (Fla.1980).

The record shows that First Liberty complied with each of these duties, and the duties which Ms. Maldonado seeks to impose upon First Liberty are not duties imposed upon insurers as a matter of law. The undisputed evidence shows that First Liberty immediately recognized the gravity of the accident and the potential risk to the Clinches and warned them—in a letter sent the same day the accident was reported—of the risk of an excess judgment. *See* First Lib. Mot. for Summ. Jdgmt., Exhibit C. The record further shows First Liberty agreed to tender the entire policy limit within weeks of the accident and upon the estate's first demand, continuously offered to pay the full policy limits to the estate throughout the negotiations, and even sent two checks in payment of the policy limits, both of which were returned voided by the estate. *See id.*, Exhibits G, S, T, U, W, Y; Maldonado Mot. for Summ. Jdgmt. at ¶ 4. Indeed, so consistent was First Liberty's attempts to pay the full policy limit that the estate eventually told First Liberty not to send the check again unless it agreed to do so without requiring that the estate release the Clinches from further liability. *See* First Lib. Mot. for Summ. Jdgmt., Exhibit Y.

Moreover, throughout the months of negotiations, and before the demand was increased to $1 million, First Liberty warned the Clinches three times of the risk to them of not completing the sample affidavit in order to settle the dispute. In its first letter to the Clinches, sent the same day the Clinches reported the accident, First Liberty warned the Clinches that "there is a potential exposure in excess of your policy limits." *See id.*, Exhibit C (January 29, 2004). First Liberty then sent more letters, each repeatedly warning the Clinches they could face an excess judgment if they did not complete the affidavit the estate required. *See id.*, Exhibits H, N, V (May 17, May 26, and June 22, 2004). First Liberty repeatedly warned the Clinches of the importance of obtaining a release of liability and that if they did not complete the affidavit, the estate would likely file a lawsuit against them. *See id.*, Exhibits H, M, O, V, X. First Liberty repeatedly advised the Clinches to retain an attorney to protect themselves. *See id.*, Exhibits H, N, V.

The undisputed evidence in the record shows that First Liberty, over and over again, from the time the accident occurred until suit was filed, tried to resolve the matter by tendering the policy limits, requiring a release of liability for the Clinches, and advising the Clinches of the importance of completing the affidavit to avoid a lawsuit and excess judgment. I have found no cases—in or outside of Florida—where an insurer, under facts similar to these, has been held to have acted in bad faith. I do not believe that any jury could reasonably find that, under the facts of this case, First Liberty was acting in *its own best interests* and in disregard of the interests of the Clinches. In fact, First Liberty immediately tendered the policy limits and diligently communicated—both with the Clinches and the estate—to facilitate a settlement.

First Liberty, as is required under *Boston Old Colony*, investigated the facts, gave fair consideration to the estate's settlement offer for the total policy limit, immediately offered the policy limits, told the Clinches of settlement opportunities, advised them as to the probable outcome of the litigation, warned them of the possibility of an excess judgment, and advised them of steps to take to avoid excess judgment, namely to complete the sample affidavit. *See Boston Old Colony,* 386 So.2d at 785. There is no evidence in the record that First Liberty tried to avoid or delay settlement, was more concerned with its own interests over the Clinches', or in any way obstructed a settlement of this case. That is the type of conduct that is the essence of bad faith, and it is utterly lacking here. *See generally Macola,* 953 So.2d at 455; *Ruiz,* 899 So.2d at 1125; *Laforet,* 658 So.2d at 58; *Shaw,* 184 So. at 859; *Cooper,* 61 F.2d at 448.

Some examples of bad faith include an insurer willfully and without reasonable cause refusing to disclose the policy limits of its insured to a claimant, despite being formally asked three times, thus depriving the claimant of the basis to evaluate the case and hindering a settlement, *Powell v. Prudential Property & Casualty Insurance Company,* 584 So.2d 12, 14 (Fla. 3d DCA 1991); an insurer, knowing liability was clear against its insured, not making any settlement offer within the policy limits until five months after the claimant first contacted the insured and five months after the lawsuit was filed, *Snowden v. Lumbermens Mutual Casualty Company,* 358 F.Supp.2d 1125, 1126–27 (N.D.Fla. 2003); an insurer rejecting the claimant's offers to settle within the policy limits four

times, believing that because its insured would soon file for bankruptcy—and later had filed for bankruptcy—it could not be held liable for bad faith since its insured would not be personally liable for any excess judgment, *Camp v. St. Paul Fire & Marine Insurance Company*, 616 So.2d 12, 14 (Fla.1993). First Liberty did not engage in any conduct even similar to these examples. It immediately disclosed and offered to tender the policy limits and quickly communicated with both its insureds and the estate.

Even the case Ms. Maldonado cites as one of her best cases is readily distinguishable. In *Berges v. Infinity Insurance Company*, 896 So.2d 665, 669 (Fla.2004), Ms. Taylor was killed, and her minor daughter was injured, when her car collided into a car owned by Mr. Berges on March 29, 1990. Mr. Berges was covered by an Infinity insurance policy with $10,000/per person and $20,000/per accident bodily injury limits. *See id.* Infinity conducted an investigation and, by April 20, 1990, concluded the driver of the Berges car was entirely at fault. *See id.* On May 2, 1990, Mr. Taylor, the widower of Ms. Taylor and father of the injured minor, directly contacted Infinity and offered to settle his wife's wrongful death claim and his daughter's injury claim for the entire $20,000 policy limit. *See id.* He conditioned the offer on the requirement that Infinity pay the policy limit on the wife's claim by May 27, 1990, and the minor's claim by June 1, 1990. *See id.* Because he had not yet been appointed as personal representative of the estate and he recognized that court approval might be required for the minor's settlement, Mr. Taylor gave Infinity a few alternatives: Infinity could pay him personally, pay him as personal representative, or could place the settlement funds in separate interest bearing accounts. *See id.* He further promised to assist the insurance company's lawyers in obtaining court approval to settle the minor's claim, but insisted that these sums be paid within the deadlines because he had missed work and had mounting medical bills to pay for his injured daughter. *See id.*

Infinity agreed to pay the policy limits and retained an attorney to obtain court approval for the minor's settlement. *See Berges*, 896 So.2d at 681. But Infinity never contacted Mr. Taylor, never followed up with its attorney to stress the urgency of the time limits, never informed Mr. Taylor there was a problem with obtaining court approval of the minor's settlement within the deadline, never asked Mr. Taylor for an extension of time, and never responded to Mr. Taylor's suggestion to place the funds in interest-bearing accounts until court approval could be obtained. *See id.* Moreover, Infinity never informed its insured, Mr. Berges, of the negotiations between itself and Mr. Taylor, of the probable outcome of a lawsuit that could be filed without the settlement, or of the possibility of excess judgment, until *after* the deadlines passed and Mr. Taylor had withdrawn his offer and filed suit. *See id.* at 681–82. Even more egregiously, when Infinity finally did disclose the settlement negotiations to its insured, Mr. Berges, it was not honest with him. *See id.* at 682. Infinity told Mr. Berges that it had offered Mr. Taylor the policy limits but that Mr. Taylor had refused to settle for that amount. *See id.* Furthermore, Infinity never disclosed to Mr. Berges the details of the offer, the missed deadlines, or the missed opportunity to settle because Infinity did not accept Mr. Taylor's offer to have the funds placed in interest-bearing accounts. *See id.*

Not surprisingly, the Florida Supreme Court found that Infinity, by so excluding

its insured from the settlement process, had deprived him of the ability to retain independent counsel and to try to expedite any necessary court proceedings. *See id.* All of these combined facts, the Florida Supreme Court concluded, constituted competent substantial evidence to support the jury's finding that Infinity had acted in bad faith. *See id.*

Understanding that no two cases are alike, none of these acts on the part of Infinity compare to those of First Liberty in this case. Here, First Liberty constantly and timely communicated with both the estate and the Clinches, repeatedly warned the Clinches of the risks of an excess judgment, advised the Clinches to execute the sample affidavit, and told them of what might happen if they failed to sign the affidavit. Finally, First Liberty repeatedly advised the Clinches that they might want to retain private counsel. There is no evidence that First Liberty's conduct toward the Clinches lacked candor in any way. There is also no evidence that First Liberty failed to apprise the estate of the problems its insured had with the revised affidavit.

Ms. Maldonado nevertheless argues that First Liberty had more than five months to address the issues the Clinches had with the affidavit but instead "did nothing until the time demand for settling within the policy limits expired." *See* Maldonado Mot. for Summ. Jdgmt. at ¶ 12. This argument is at odds with the undisputed facts. First Liberty did vastly more than "nothing" to resolve any hindrances to settlement. In fact, when the estate's attorney, Mr. Snyder, first insisted on an asset affidavit, he did not send First Liberty a sample of what he wanted. Only after receiving an affidavit that he found unacceptable did Mr. Snyder send a sample of

what he would accept. After the Clinches refused to complete the sample affidavit despite First Liberty's warning that failure to complete it would likely result in a lawsuit and possible excess judgment, First Liberty immediately informed Mr. Snyder that the Clinches found the sample affidavit "very invasive in [its] request for extremely personal information, which has nothing to do with any assets." *See* First Lib. Mot. for Summ. Jdgmt., Exhibit Q. Ms. Klein of First Liberty invited Mr. Snyder to revise the affidavit and advised him that she would forward them to the Clinches. *See id.* Mr. Snyder, in response to this information, did not inquire as to what information—unrelated to assets—the Clinches objected. Rather, he sent a letter in response stating that, upon reviewing the sample affidavit again, "we find every request reasonable under the circumstances." *See id.,* Exhibit R. His letter went on to state:

> Yes, the information requested in the affidavits is of a personal nature, but it is reasonable under the circumstances— your insureds left Mrs. Maldonado without a husband and three minor children without their father. You do not want to know how Mrs. Maldonado feels about your clients' objections to the inconvenience of providing personal information after what your clients have done.

*See id.* First Liberty forwarded this response from Mr. Snyder to the Clinches with another reminder that they would not be released from liability by the estate without the affidavit. *See id.,* Exhibit T. This is the antithesis of doing "nothing."

Ms. Maldonado asserts that even First Liberty's own expert witness, Jeffrey Posner, agrees that "First Liberty should have provided Mr. Snyder with the Clinch-

es' specific concerns regarding their Social Security and bank account numbers." *See* Maldonado Resp. to First Lib. Mot. for Summ. Jdgmt. at ¶ 8. She then attaches a few pages from Mr. Posner's deposition. After reading the actual transcript pages, I find this a skewed reading of Mr. Posner's testimony. In fact, in the short excerpt of testimony cited by Ms. Maldonado, Mr. Posner reiterated over and over again that First Liberty *did* provide to the estate the Clinches' concerns regarding disclosing social security and bank account numbers. *See id.,* Exhibit C. Mr. Posner testified that the information regarding the Clinches' concerns was "subsumed within the phrase 'personal financial information'" in the letter where First Liberty states that the Clinches "find[ ] these affidavits very invasive in their request of extremely personal financial information, which has nothing to do with any assets." *See id.*

At oral argument, Ms. Maldonado asserted that Mr. Posner testified that if he had been conducting the negotiations, he would have "picked up the phone" and told Mr. Snyder that the Clinches specifically objected to providing social security and bank account numbers. This testimony, however, was not included with the motions or responses and was not otherwise submitted into the record. I cannot, therefore, verify that Mr. Posner actually testified about what he would have done in this situation. Assuming, however, that he had testified as such, I cannot say that this creates a question of fact that would preclude summary judgment. From what Ms. Maldonado argued in the hearing, Mr. Posner did not testify that Ms. Klein's not

picking up the phone and using the exact words of "social security and bank account numbers" with Mr. Snyder was bad faith. And even if he had so testified, such testimony would not preclude summary judgment. *See St. Paul Fire and Marine Insurance Company v. Shure,* 647 So.2d 877, 878–81 (Fla. 4th DCA 1994) (despite expert testimony at trial that settlement was in bad faith, directed verdict was proper where court determined insurer had not acted in bad faith as a matter of law because no evidence regarding insurer's conduct met the high standard for bad faith in contributions claim).

Also at oral argument, Ms. Maldonado referenced the testimony of her own expert witness, Lou or Lewis Jack. This testimony also was not filed with any of the motions or responses nor otherwise submitted into the record. I cannot, therefore, verify anything about Mr. Jack, from what his full name is to what his testimony was. Ms. Maldonado cannot avoid summary judgment by relying upon evidence that is not in the record; it is her burden to show the existence of a genuine issue of fact created by evidence *in the record.* *See Burton v. City of Belle Glade,* 178 F.3d 1175, 1187 (11th Cir.1999) ("To withstand a summary judgment motion, the non-moving party must establish that, based on the ***evidence in the record,*** there can be more than one reasonable conclusion as to the proper verdict.") (emphasis added); *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996) ("For factual issues to be considered genuine, they must have a real basis in the record.").[3]

Ms. Maldonado contends that First Liberty should have sent someone to the

---

**3.** The statements of counsel at oral argument are not evidence, and they cannot be used to preclude summary judgment. *See generally Green v. School Bd. of Hillsborough County,*

*Fla.,* 25 F.3d 974, 979 (11th Cir.1994) (statements by counsel as to worker's color and national origin are not evidence, thus where no other evidence existed in the record as to

Clinches' home to pick up the affidavit or suggested a sworn statement regarding assets to ease the Clinches' fears regarding putting personal information in the affidavit. *See* Maldonado Mot. for Summ. Jdgmt. at ¶ 12. I have found no cases—and Ms. Maldonado has cited none—imposing such specific additional duties on an insurer, much less an insurer which offers to settle for the policy limits, advised its insureds of the possibility of excess judgment, and advised its insured to execute the sample affidavit. Had Mr. Snyder suggested a sworn statement, and had First Liberty ignored this suggestion, failed to inform the Clinches of this alternative, and failed to tender the policy limits, this case *might* be closer to *Berges*. But here, First Liberty was attempting to comply with the requirements set forth by the estate in its demand, which insisted quite adamantly upon an affidavit in the exact form it had supplied to First Liberty. *See* First Lib. Mot. for Summ. Jdgmt., Exhibit R.

Ms. Maldonado also says that First Liberty "failed to advise Mr. Clinche of the steps that might be taken to avoid excess judgment" and "failed to adequately advise the Clinches of the probable outcome of litigation and warn them of the possibility of excess judgment." *See* Maldonado Mot. for Summ. Jdgmt. at ¶¶ 13 & 14. This assertion lacks merit given the undisputed evidence showing that First Liberty repeatedly warned the Clinches that failure to complete the asset affidavit would likely result in not obtaining a release, a lawsuit being filed against them, and an excess judgment being entered against them, which the Clinches would have to pay.

Even Ms. Maldonado cites to Ms. Klein's warning to the Clinches that if they did not sign the affidavit, excess judgment could be entered against them and "they would have to make good on the judgment." *See id.* at ¶ 14.

According to Ms. Maldonado, First Liberty should have gone further and explained to the Clinches that their credit could be impacted by an excess judgment and that they might have to reveal the judgment against them on a job application. *See id.* But there are no cases—and again Ms. Maldonado has cited none—imposing upon an insurer a duty to advise its insured as to the particular, individualized effects of an excess judgment upon their insured's credit or ability to get a job. In fact, to provide such particularized warnings, First Liberty would have to have an intimate understanding of the Clinches' financial situation, credit situation, job situation, and other details of their lives. I have found no law requiring that an insurer probe into its insured's life in such an intimate way so that it could advise the insured as to all the particular ramifications of an excess judgment to that insured specifically.

Indeed, if I were to impose such a duty, it is hard to define where that duty would end. Would an insurer have a duty to advise its insured as to the effects of an excess judgment on his children's college financial aid applications, on its insured's ability to refinance his home in a particular housing market, or on its insured's ability to be accepted into a professional association, such as the Florida Bar? Ms. Maldonado seems to be arguing for a duty that knows no end. She seems to suggest that

those facts, district court's finding that worker was part of non-protected class was clearly erroneous); *United States v. Smith*, 918 F.2d 1551, 1562 (11th Cir.1990) ("statements and arguments of counsel are not evidence").

whatever would have changed Mr. Clinche's mind to sign the affidavit is what the law required First Liberty to do, and that the alleged failure to push the right buttons to persuade Mr. Clinche constitutes bad faith. I find no support for extending the duty owed by an insurer that far. The estate made its demand, and First Liberty sent a check for the policy limit, reasonably insisted on a release for its insured, counseled its insured to comply with the settlement demand—including execution of the sample affidavit—and warned them of the risks of noncompliance. That was the extent of First Liberty's duty.

Florida law requires an insurer to investigate the facts, give fair consideration to a settlement offer that is not unreasonable, advise its insured as to the probable outcome of litigation, warn its insured of the possibility of an excess judgment, and advise its insured of any steps to avoid excess judgment. *Boston Old Colony*, 386 So.2d at 785. The undisputed evidence in the record shows that First Liberty did all of these things, and the law requires nothing more. *See Caldwell v. Allstate Insurance Company*, 453 So.2d 1187, 1190 (Fla. 1st DCA 1984) (affirming summary judgment in favor of insurer where it was apparent from the record that insurer exercised reasonable diligence and insurer had not engaged in conduct typical of a bad faith claim).

In fact, the case that this matter most resembles is *Boston Old Colony*, where the case failed to settle within the policy limits due to the conduct of the insured—and not the insurer. In that case, Mr. Brown and Mr. Gutierrez were involved in a head-on collision, after which both men claimed that the other was at fault. *See Boston Old Colony*, 386 So.2d at 784. Mr.

Gutierrez sued Mr. Brown, who was insured under a $10,000 policy with Boston Old Colony, which defended him. *See id.* Boston Old Colony investigated the accident and concluded that Mr. Brown's account was correct and that Mr. Gutierrez was at fault. *See id.* Knowing that there was still a question about liability, that Mr. Gutierrez' injuries were extensive, and that an excess judgment was a possibility, Boston Old Colony warned Mr. Brown of these risks and suggested settlement of the matter for the policy limits. *See id.* Mr. Brown, however, was opposed to settlement because he had filed a counterclaim against Gutierrez for his own injuries and did not want to make an admission of fault that would be implied by an offer to settle. *See id.* Boston Old Colony and Mr. Brown, therefore, executed a hold harmless agreement whereby Brown assumed responsibility for any excess judgment. *See id.* Before trial, Mr, Gutierrez offered to settle his claim against Mr. Brown for the policy limits, but Boston Old Colony Brown rejected the offer and denied liability. *See id.* Mr. Brown later settled his counterclaim against Mr. Gutierrez, and Boston Old Colony then offered to settle Mr. Gutierrez's claim against Mr. Brown for the policy limit. *See id.* But Mr. Gutierrez, at this point, preferred to proceed to trial and rejected the offer. *See id.* The trial resulted in a judgment against Mr. Brown for $1,400,000, after which Mr. Gutierrez brought a bad faith action against Boston Old Colony for failing to settle the claim within the policy limits when it had the opportunity. *See id.* at 784–85.

The Florida Supreme Court held that, under those facts, no reasonable jury could have concluded that there was bad faith on the part of Boston Old Colony. *See id.* at 785. The Florida Supreme Court set aside

the jury verdict in favor of Mr. Gutierrez, reasoning that at all times, Mr. Brown contested liability, had evidence to support his position, and expressly requested that Boston Old Colony not settle the claim because he was pursuing a counterclaim. *See id.* at 785–86. It noted that at all times Boston Old Colony "was ready to settle, expressed its willingness to settle, and only because of the explicit request of its own insured did not settle." *See id.* at 786. The Florida Supreme Court further explained that Mr. Gutierrez refused to settle when Boston Old Colony offered the policy limits prior to trial. *See id.*

This case, though obviously not identical to *Boston Old Colony,* is nevertheless similar. First Liberty, like Boston Old Colony, at all times recognized the liability of its insured and was, therefore, ready to settle for the policy limits, expressing to all those involved its willingness to settle, and did not settle only because of the conduct of its own insured. As a matter of law, there was no bad faith on the part of First Liberty.

### IV. Conclusion

First Liberty's motion for summary judgment [D.E. 36] is GRANTED. Ms. Maldonado's motion for summary judgment [D.E. 33] is DENIED. A final judgment will be issued separately.